Mr. Weisberg, good morning to you. Welcome. Please proceed. May it please the Court, Your Honor, I will reserve five minutes for rebuttal. We believe the judgment of the trial court should be reversed. The reasons set forth in our brief brief would like to address two primary points. First, before I start, I would note that because of the multi-contractor, multi-contract nature of this procurement, the relief that OTI seeks will in no way halt the U.S. passport program or halt the administration of the electronic nature of that program. The relief that we seek would allow OTI to be reinstated into the competition. We understand. Your Honor, the first point to address, the first point to address is the lack of independent judgment. The contracting officer testified during her deposition in the solicitation made it clear that the evaluation factors for awarding this contract were a combination of international technical standards that are referred to in the briefs as the ICAO, International Civil Aviation Organization. What is the bottom line of your position? The bottom line is that the contracting officer testified that she had never read the actual evaluation factors that were going to be used for award. Meaning what? She hadn't read the International Aviation Organization test protocols? Your Honor, those test protocols... You've got to be specific with me or I'm not going to be able to follow what you're saying. Yes, Your Honor. That the solicitation set forth by referencing various specific standards what the actual tests were going to be, a and you're saying she didn't read the text of the underlying documents. She never read any of the actual tests that were going to be used. Your Honor... I'm trying to figure out what she did read and what she didn't read. Can we agree that she read the solicitation, she might have actually written it, she read the NIST report, she read Technical Advisor Grasso's assessment of the NIST report, and then she wrote two letters explaining why your client was being excluded from further evaluation and competition. So you seem to be saying, if I'm following you at all, that that wasn't enough, that she had to also have read the underlying OSI or International Aviation Organization test protocols. Well, Your Honor, since the contracting officer testified that those test protocols were the evaluation factors for award, it appears incumbent on the contracting officer to be familiar with the evaluation factors. But can't she rely on her experts? Didn't she? Your Honor, the case law says that while she can utilize experts, she still has to use independent judgment. The courts have used phrases like, take ownership of the process, be familiar with the process. Well, that's thoroughly unhelpful. I mean, I'm trying to get something concrete and specific from you as to what it is you think she had to do that she didn't do. Your Honor, the testimony showed that, despite the fact that solicitation listed a variety of test protocols, that the NIST testers, who the government used, did not follow those protocols. They came up with a third set of protocols, which they used. The contracting officer's lack of familiarity with the basic evaluation factors, what was being tested, indicated that she was not in a position, through lack of knowledge, to utilize independent judgment. I don't understand your argument at all. As Judge Lurie suggested, she relied on technical experts, people at the International Aviation Organization. Mr. Grasso, I don't see anything in the case law that says a contracting officer is not allowed to rely on technical people for technical matters. Now, is your argument that she had to have sufficient mastery of the testing protocols and other technical matters herself without that assistance? No, Your Honor. Well, what is your actual position? Your Honor, for example, there were, for one type of electronic test, the solicitation said that the passports were going to be tested at several voltages, 2, 4, 6, 8, and 15. They were not tested at those voltages. They were tested at some of them, but not all of them. They were tested at some of them, Your Honor. The evaluation factors, she testified that these standards were the evaluation factors. The evaluation factors were not tested. On this example, some were used, others were not used. We don't say that the contracting officer has to be an electrical engineer, but she has to have at least a familiarity with what evaluation factors she has to make her decision on. What is the evidence that she didn't know what to look at by way of tests and test results? I understood that she read the NIST test report. She read Grasso's analysis of them. She did an analysis. She wrote you two letters explaining her rationale. That suggests a certain amount of knowledge, a certain amount of judgment. Obviously, in your view, not enough. So I'm trying to figure out what's the delta? What was it that she didn't know or didn't think of her own mental process that you think the law required that she, not Grasso, not NIST, not anybody, she had to do? Your Honor, she did not know, for example, after reading the NIST report, that several of the solicitations evaluation factors had not been followed. She did not know that, for example, when there was testing, supposedly testing at 1.5, 4.5, 7.5 millivolts, she did not know that 4.5, that it was never tested at 4.5. We're saying, Your Honor, that these And we know this only because her deposition was taken. Her deposition was taken. How are we going to ever learn this? I mean, if we rule the way you want us to rule, it means, doesn't it, that every contracting officer's deposition is going to have to be taken if there's any suggestion of independent judgment being raised. Your Honor, we understand that the standard is that the court has discretion, but a presumption against supplementing the administrative record. In this case, which was a follow-on to a previous case where the lower court, where Judge Alito had found in the first OTI case that the contracting officer had not utilized independent judgment, here, the reports, the indications from what the contracting officer had done were unclear as to whether she had actually followed these test results. The actual paper administrative record, though, indicated that a number of these tests had not been followed. But isn't it clear from the NIST testing reports exactly what tests they did, and therefore easy to see what tests that maybe, arguably, they should have done that they didn't do? And, Your Honor, the fact that the contracting officer read the NIST test report and did not realize, according to her deposition, that certain aspects of the solicitations evaluation criteria were not followed indicates one of the three prongs of lack of independent Because of the complexity of the volume of the international standards, I think it's easy to make more of them than they are. They are like, in essence, when you drill down any other Section M evaluation criteria of a solicitation, an offeror can, by looking at those, and particularly these offerors who were all in this business, can look at those standards, most of these offerors participated in the process of developing those standards, look and see specifically which tests were going to be performed, testing at these voltages, testing at these amperages, testing with this type of impact, this type of bend. When offerors look in a solicitation, even if that solicitation requires cross-referencing to other documents, recall, Your Honor, that the government in the solicitation said the contractors are expected to look at the ICAO website to keep up-to-date on these evolving standards. Let's get back to this contracting officer's mental process. That's what your beef is all about. Your Honor, our beef, as you put it, is that the contracting officer looked at this test report, did not realize that certain tests had been followed, other tests had been not followed, and still more tests had been done that were nowhere in the solicitation. While the government has argued that the government was free to add these types of tests and impact tests, irrespective of what the solicitation said, the contracting officer, by deciding to eliminate OTI on the basis of what we believe her deposition shows, was a very incomplete knowledge and familiarity with the basic evaluation factors. I don't understand how you get there. It may be that she didn't know every voltage of every test that the standards referenced in the solicitation called for, but that doesn't show that she didn't know what was going on, was in no position to evaluate whether this was a pass-fail test. That's what she had to decide. Did they fail enough tests to get knocked out of the competition or not? Well, Your Honor, exactly. But you seem to be saying that if she hadn't memorized every standard, every test, every voltage, so that in her deposition she could rattle off which ones were at variance, arguably with the solicitation, that that's definitive proof that she didn't exercise independent judgment. That just sounds preposterous. Your Honor, if the contracting officer did not know what tests were going to be performed, how could she possibly make a judgment as to what is sufficient to pass and sufficient to fail? Well, usually we ask the questions here, not attorneys at the podium. I'm sorry, Your Honor. By not being aware of what tests were required to be performed. She was aware. She didn't have a perfect awareness of every test and every voltage. That's not the same thing as being generally unaware of evaluation criteria. Your Honor, for example, one of the other contractors, Exalto, failed a 15 kilovolt test, what the NIST testers described as a dead chip failure. Yet the contracting officer went ahead and passed them on to the next stage, doing so even though her supposed expert said that that would result in a dead chip, an unreadable chip. We believe that what the contracting officer did was simply take a recommendation from her technical advisor, Mr. Brasso, which recommended that OTI be eliminated, and simply rubber stamped it. As we noted, the only questions she ever asked of Mr. Brasso were administrative in nature. Was there a date here? Was this particular report properly enumerated? There was never any technical questions, never any explanation or request for a rationale. Why is this test failure sufficient to eliminate contractor X or OTI, despite what the ICAO standards may say about it? Because the basic problem was that you failed some of the tests. Yes, Your Honor. Lots of the tests. And you've already had two trials, and you had the second one because you won something on the first one. You had a second chance, and you failed that. And, of course, now you're arguing that, well, the CO didn't do her job right. Well, Your Honor, what we're arguing is that there was unequal treatment here. That in addition to the CO not doing her job right, that, for example, Exalto was passed through to the next stage with what the NIST testers described as a dead chip failure. OTI was eliminated for a failure at a 1.5 milliamp, which the solicitation standard, annex K to the ICAO standard, described as below the threshold for interoperability, and interoperability being the key to passing that test. I say that the contracting officer's lack of knowledge led to, among other things, unequal treatment of the offerors and an objectively incorrect reading of what the test results were. Do you want to save any rebuttal time? Yes, Your Honor. All right. Thank you, Mr. Weisberg. Mr. Kinner? May it please the Court. Indeed, the merits of this appeal and the action below are really disposed of by a single document. The debriefing letter, the August 1, 2006 letter, which appears at AR 06 at page 44, is a complete statement of the resolution of this case. It is a precise statement by the contracting officer of the rationale for the decision. But Mr. Weisberg is implying, at least in my impression, that really Grasso wrote the letter, in sum and substance, because she didn't have a clue about anything. It was all Grasso's thinking, and therefore the letter was as bad as everything else because it's really only Grasso's brain that's at work here and not hers. And clearly that's incorrect, Your Honor, because as a matter of fact, even in the deposition, which of course should never have occurred in this APA review case, at page 16 of T4, section of the appendix, the contracting officer explicitly testifies, in making those judgment calls, I received the contracting officer technical representative's report and the NIST report that was attached to it. I evaluated those reports and compared the COTAR's report to the NIST report, as well as, you know, having further discussions with the COTAR about certain questions I didn't understand or clarify certain matters that were included in the report to make my independent judgment on that decision. Now indeed, that's just one paragraph of this deposition. Frankly, the contracting officer testimony is consistent throughout, over and over again, saying that indeed she did rely upon these experts, but she did evaluate what the experts did. Evaluate, of course, is not in a technical sense, but evaluate in an administrative sense. She exercised her independent judgment to ensure that a proper testing procedure was taken, that it covered the requirements of the solicitation, and that the conclusions, indeed, the recommendations of Mr. Grasso, which appeared in his extensive report, which is in AR 06, beginning at 131, that she could adopt those recommendations on a very reasonable basis, more importantly, a very rational basis. Indeed, the testing that was done by NIST was done on a blind basis. The products that were tested from each offeror were only listed in the NIST report by a number and not by identification. And indeed, it was not even reflected until at the conclusion of the Grasso report and through the, I think it also— Well, that doesn't seem germane. He's not suggesting that the NIST testers rigged it because they had bias in favor of one competitor versus another. That's not an issue in the case. Although, quite the contrary, Your Honor. No, no. The point of the blind testing is that it was entirely reasonable for this contracting officer to entirely rely upon this independent testing organization and the contracting officer's technical representative for their technical analysis. Did Grasso's report acknowledge any of the variances between the testing protocols referred to in the solicitation compared to the actual performance of tests by NIST? There's one thing in the Grasso report that specifically stands out, and that was a description how— Actually, I believe that—I'm sorry. It may not even go to the NIST report. It may be going to the—No, actually, it does go to the NIST report. I'm sorry. It's an extensive report from him where they're discussing that a number of tests were not done because notwithstanding the Department of State had asked for them to be done, there was an actual—there was inadequate documentation in support for testing. So NIST didn't do it. NIST actually made its own decisions about what to test and to ensure that the products that it was testing would meet the standards adequately, and adequately test to ensure that they would meet the standards. And so, indeed, the contracting officer understood the tests that were called out in the contract, and, indeed, they appear in the appellant's brief at page 15 and page 17 where they acknowledge what the tests were and they acknowledge what the results were. The differentiation between the appellant's assessment of what NIST should have done vise the international standards and what NIST chose to do is not any kind of attack on the judgment of the contracting officer. In fact, what it is, it's suggesting, as they did below and as they, in essence, are doing here, is asking the court to conduct a de novo review. Rather than making the assessment of whether the contracting officer exercised reasonable judgment based upon the extensive technical rationale presented to her, rather, indeed, below, the appellant actually offered to the, more than offered almost, insisted to the trial court that they be able to conduct the tests again. I suppose you'd agree, Mr. Kinner, that if the facts established that this contracting officer actually was a, to use the derogatory term, rubber stamp, that that would not, that she would not have been shown to use independent judgment. Well, yes and no, Your Honor, but surprisingly, I don't have an immediate yes to that question. The only reason I hesitate... You mean she can be an independent rubber stamp? Well, I guess I want to clarify my agreement to that about the rubber stamp. As in, one of the cases relied upon by the appellant is the Sims case, or the CEMS case by the trial court below and Judge Horn. And in that case, she very carefully identifies how, when there is a properly done technical effort, that the contracting officer is absolutely entitled to rely upon that. And in that situation, I'm afraid someone could accuse the contracting officer of being rubber stamped, because indeed the contracting officer has only the technical knowledge that is provided to her by the people... Okay, well that was my next question. So she absolutely relies on everything that's given to her, but she can make an independent judgment about the independence of the testing, the blind testing, the qualifications of Mr. Grasso, her experience with Mr. Grasso as a reliable advisor. Right. And she doesn't have to know anything at all about the testing. Is that your position? And that's why I go to the Sims case, because while the plaintiff, the appellant, misunderstands and relies on that case to support their argument against this contracting officer's actions, indeed what that case reveals is that the part of the contracting officer's reliance upon technical things in that case that was upheld by the trial court in that case was where the contracting officer looked at the technical reports and had a reasonable, rational basis to rely on. It was clear that they were comprehensive and that the recommendations brought forth from those technical reports were things that on the face, by a reasonable review, could be determined. Where the contracting officer had failed in the Sims case, in CMS, I don't know whether we should call it Sims or CMS, was where the contracting officer relied upon an incomplete and clearly insubstantial work. In fact, actually the work that was insubstantial in that case, which the contracting officer was faulted on, was by, I believe, a former contracting officer who had been hired to assist in writing the decision. And he hadn't done a sufficient analysis, he hadn't done a sufficient investigation, and there the contracting officer was properly faulted for, and that's why I want to parse out what rubber stamps are good and what rubber stamps are bad, because that was a rubber stamp that was clearly inappropriate. Because on its face, the contracting officer should have been able to identify that the work that supported the recommendations was incomplete, and whether or not she had gone back and done that work over again or the necessity to do the analysis differently was probably not needed, but certainly being able to establish so that the rubber stamp is valid and rational. Here, and that's why I brought up the point about that we have a separate, in this case it's just glaring, that we have a separate independent testing organization that conducted blind tests. On that basis alone, we're done. And that's why I would suggest, and indeed there is just a pile of documentation in the administrative records alone that answered this question, and so supplementation was just utterly unreasonable here. Between the debriefing letter, which is at AR 0644, and then much earlier, the notice to OTI that they had failed, which was the July 26th letter, and that's at page 38 of AR 0644. Mr. Kinner, suppose that the solicitation had called for tests A, B, C, and D, and it was farmed out to NIST, and they did J, K, L, M. Wouldn't that be a problem? Wouldn't that be such a departure from what the competitors were put on notice they should be prepared to meet as to create a ground for relief? And it wouldn't make any difference how well NIST performed those tests or what a top rate outfit NIST is or how unbiased they were because it was blind tested and so forth. If they did tests that were seriously at variance with the solicitation, the quality of the testing would seem to be irrelevant. Yes, Your Honor, I agree. A portion of Mr. Weisberg's argument is that the wrong tests were done and some of the right tests weren't done. Indeed, Your Honor. Why don't you address that? Appellant is trying to transmute the facts and events in this case into that scenario. That's not what occurred here. Indeed, Appellant wants to argue below and is arguing here that there was a set of tests wholly independent from what was conducted that should have been conducted and that somehow it was misled in the solicitation. Clearly, that's not the case. And herein lies the fundamental error in Appellant's position before this court, and that is the assertion that, well, indeed in Appellant's argument, that the 1.5 amps per meter test was either not specified or shouldn't have been carried out clearly is incorrect. In fact, the international standards that were referenced in the contract specifically and which the contracting officer repeatedly said in her deposition, look, these are referenced in there. That's what I know they were relying on and that's what I relied on, that they, I.B. Nist and Grasso, were relying on these international standards to do what they did. Explicitly, those international standards, contrary to what Appellant's counsel said a moment ago, say that the 1.5 standard is the absolute minimum, but that minimum must be maintained. It's mandatory. At page 940 of AR06, this is the ISO standard, it's the 10.373 amended 6, which below and before this court, Appellant has repeatedly argued, oh, well, this is the standard that should have been adhered to. Indeed, at page 940, it says the output power should be adjustable to deliver HVL, HVLs are the field strength of the antenna, the antenna response, in the range of 1.5 amps per minute to 12 amps per minute. In the, at page 959 of AR06, it has a chart explicitly requiring, as the minimum, 1.5 and 1.5 amps per minute under the conditions defined in table 1, and those appear in that table, shall answer to the inquiry, I'm sorry, what shall answer is the chair. Was anybody supposed to compare the tests called for by the solicitation with the tests actually performed by NIST? Was anyone, no, I don't think so precisely. I thought I saw some reference to her wanting to be reassured that the State Department had verified the NIST test results. What was that all about? Well, that was because, in fact, NIST was required to do that, NIST was asked to assist in this procurement by the State Department. There were actually two agencies involved. Was state supposed to verify that the tests as called for by the international bodies were the tests performed by NIST? Well, yes and no. Yes, the testing plan that was done by the State Department, in essence, did that. A lot of the tests that were done, the durability tests, of course, this is another major flaw, we believe in McClellan's position here, the durability tests that NIST utilized to ensure compliance with international standards, well, there actually weren't any international standards of durability when this contract was issued. And so, it was entirely up to NIST to determine what standards were appropriate. When the OTI product failed at the 1.5 amps per minute, failed completely, 0 out of 10 successful, and then failed 2 and 3 times out of 5 in the durability test, as the contracting officer stated in the debriefing letter. This has nothing to do with the role of the State Department, right? That's all I asked about. No, no, no, Your Honor. In essence, the State Department's role was simply identifying its concerns, because, of course, the State Department is the ultimate consumer here. That may be an overstatement, but it is more or less the ultimate consumer here for these passports. And so, the State Department was performing the, and when I say State Department, actually the State Department's contractor was performing the stage 2 or 3 test where they ran the books through printers to ensure that they were produced acceptable. All right, I think we have your case. Your time has expired. Mr. Weisberg, you have a little bit of rebuttal time. Thank you, Your Honor. Your Honor, the court clearly has put its finger on the key to the second part of our argument, and the government has acknowledged that in its presentation, that NIST did not perform all of the tests that were required by the solicitation, performed some tests that were not set forth in the solicitation. That use of undisclosed evaluation criteria or deviation from the criteria in the solicitation is a bedrock violation of procurement law. It's codified in both regulation and case law going back 25 or 30 years. The government's reference to the 1.5 milliamp failure is an incomplete reading of the standard. If you, and the solicitation requires the offerors to use the standards, including explicitly the NIST, I'm sorry, the ICAO reports and recommendations. Following that particular standard out through to an annex K, which is discussed in our papers and is in the administrative record, indicates that that 1.5, 4.5, 7.5 is used to test the concept of interoperability. And when you eventually make your way to annex K, which every offeror can do and the CO should have been able to do, that indicates that ICAO decided and wrote down that interoperability was really an issue at 2.5 milliampers and above. That failure at 1.5 was not an interoperability issue because the Japanese and Australian passport authorities use higher power, and so to be interoperable, you had to work at 2.5 or above. If the CO had done more than support said rubber stamp, would have realized that the actual recommendation did not mandate elimination for a 1.5 failure. We also note that the case law in our papers set forth very clearly what type of independent rationale and documentation of that rationale the contracting officer has to use to demonstrate independent judgment, and that what she used did not meet that standard. All right. Thank you both. The case is taken under advisement. All rise. The court is adjourned until tomorrow morning at 10 o'clock a.m. Thank you.